IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| FX Aviation Capital, LLC, | ) | |
| | ) | C.A. No. 6:22-01254-HMH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **OPINION & ORDER** |
| | ) | |
| Hector Guerrero, Mark Liker, Anatoly Galunov, Stratus Aircraft n/k/a Airlux Aircraft Inc., and LG Aviation, Inc., | ) ) ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

Before the court is Defendants Mark Liker ("Liker"), Anatoly Galunov ("Galunov"), Stratus Aircraft n/k/a Airlux Aircraft Inc. ("Airlux"), and LG Aviation, Inc.'s ("LG") (collectively "Defendants") motion for summary judgment. For the reasons below, the court grants Defendants' motion.

**I. BACKGROUND**

**A. Factual Background**

This case concerns Defendants' alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c), (d). In March 2016, Liker and Hector Guerrero ("Guerrero") contacted an FX Aviation Capital, LLC ("FX") representative, explaining that they were seeking financing on behalf of LG. (Am. Compl. ¶ 31, ECF No. 30); (Mot. Summ. J. Attach. 2 (Liker Decl. ¶¶ 4-5), ECF No. 127-2.) The two men had formed LG a few weeks earlier for the purpose of purchasing aircraft. (Mot. Summ. J. Attach. 2 (Liker Decl. ¶ 4), ECF No. 127-2.) To induce FX into providing financing, Liker and Guerrero supposedly represented that LG was financially backed by an aircraft maintenance company called Stratus

(now known as Airlux).[1] (Am. Compl. ¶ 31, ECF No. 30); (Mot. Summ. J. Attach. 2 (Liker Decl. ¶ 3), ECF No. 127-2.) Liker also provided FX with personal financial records showing that his net worth exceeded $20 million and that he had $12 million in liquid assets. (Am. Compl. ¶¶ 33, 67, ECF No. 30.) In total, FX and LG entered into nine loan agreements between 2016 and 2017 related to LG's acquisition or refinance of four aircraft – an Embraer EMB-145EP, two Learjet 55s, and a Boeing 737-400. (Mot. Summ. J. Attach. 4 (Kimbrell MSJ Decl. ¶ 2), ECF No. 127-4.) Each aircraft was pledged as collateral, and Liker and Guerrero personally guaranteed the loans. (Id. Attach. 4 (Kimbrell MSJ Decl. ¶ 2), ECF No. 127-4.)

LG began missing loan payments in July 2017. (Resp. Opp'n Summ J. Ex. B (Kimbrell Decl. ¶ 35(j)), ECF No. 146-2.) In October 2017, Liker emailed FX a letter of intent to sell the Embraer to a third-party buyer in order to satisfy the loans secured by that plane. (Id. Ex. B (Kimbrell Decl. ¶ 13), ECF No. 146-2.) The buyer withdrew its offer, however, apparently due to LG's failure to maintain the Embraer. (Id. Ex. B (Kimbrell Decl. ¶ 13), ECF No. 146-2.) FX also alleges that Liker refused to return the buyer's $50,000 deposit. (Id. Ex. B (Kimbrell Decl. ¶ 13), ECF No. 146-2.)

LG ultimately defaulted on its loan obligations on December 1, 2017. (Mot. Summ. J. Attach. 4 (Kimbrell MSJ Decl. ¶¶ 7, 28, 49, 71, 91, 114), ECF No. 127-4.) FX and LG entered into a loan forbearance agreement, but LG failed to cure its default by the January 10, 2018, deadline. (Id. Attach. 2 (Liker Decl. ¶ 28), ECF No. 127-2.) On March 22, 2018, Guerrero – seemingly acting on LG's behalf – executed a bill of sale transferring the Boeing to FX. (Id. Attach. 10 (Boeing Bill of Sale), ECF No. 127-10.) However, when FX took possession of the

---

[1] Liker states that Galunov was brought on to run Airlux in April 2018. (Mot. Summ. J. Attach. 2 (Liker Decl. ¶ 8), ECF No. 127-2.) The amended complaint contains no specific facts regarding Galunov's participation in the alleged RICO scheme.

Boeing a few days later, LG did not deliver the plane's logbooks, as required by federal regulations. (Id. Attach. 14 (Kimbrell Ex Parte Writ Decl. ¶¶ 3-4), ECF No. 127-14); see 14 C.F.R. §§ 91.417, 91.419 (requiring that the maintenance records of a "U.S.-registered aircraft" be transferred to a purchaser "at the time of sale"). LG also failed to provide the Embraer's original flight and maintenance records when it transferred the plane to FX in July 2018.[2] (Mot. Summ. J. Attach. 14 (Kimbrell Ex Parte Writ Decl. ¶¶ 3-4), ECF No. 127-14.)

Joshua Kimbrell ("Kimbrell"), FX's CEO and COO, contends that Liker retained the records in an effort to "coerce a release from a deficiency and a release of his personal guaranty obligations relative to the loan agreements." (Id. Attach. 14 (Kimbrell Ex Parte Writ Decl. ¶ 7), ECF No. 127-14); (Am. Compl. ¶ 27, ECF No. 30.) To that end, FX alleges that Liker emailed Kimbrell on July 6, 2018, stating that he would continue to withhold the Embraer's logbooks unless FX directed all prospective buyers to deal with him directly; again on July 30, 2018, "trying to evade responsibility for default" and the "disappearance" of the logbooks; and a third time on August 20, 2018, "attempt[ing] to use aircraft logbooks and records to extort money from FX." (Resp. Opp'n Summ J. Ex. B (Kimbrell Decl. ¶ 35(z)-(bb)), ECF No. 146-2.) FX also claims that an individual named Varghese Samuel ("Samuel") texted Kimbrell at Liker's direction on September 4, 2018, "demanding money from [FX] in exchange for return of the [Boeing's] flight and maintenance records." (Am. Compl. ¶ 75, ECF No. 30.)

Liker disputes that he ever "demanded that FX reduce or eliminate any of LG's or [his] debt . . . in exchange for the return of . . . maintenance records." (Mot. Summ. J. Attach. 2 (Liker Decl. ¶ 33), ECF No. 127-2.) Rather, Liker asserts that he was unaware that Guerrero had

---

[2] Guerrero transferred title of the Learjets to FX on July 19, 2018. (Mot. Summ. J. Attach. 12 (Learjet I Bill of Sale), ECF No. 127-12); (Id. Attach. 13 (Learjet II Bill of Sale), ECF No. 127-13.) FX does not allege that Defendants withheld the logbooks of these two planes.

3

transferred title of the Boeing and the Embraer to FX and therefore believed he could "control the process" of selling the planes. (Id. Attach. 2 (Liker Decl. ¶¶ 29-30), ECF No. 127-2.) In that regard, Liker claims that Kimbrell informed him in June 2018 that FX had identified a potential buyer for the Boeing, the sale of which "would be used to retire LG's debt to FX." (First Mot. Summ. J. Ex. A (Liker Decl. ¶ 3), ECF No. 81-2.) To facilitate the transaction, Liker engaged Samuel's company, Areo-Intelligence Inc., to perform a "C check" of the Boeing. (Id. Ex. A. (Liker Decl. ¶¶ 4-5), ECF No. 81-2.) Liker submits that Samuel removed the logbooks of both the Boeing and the Embraer from a hangar in San Bernardino, California and placed the records in a nearby storage facility. (Id. Ex. A (Liker Decl. ¶ 6), ECF No. 81-2); (Mot. Summ. J. Attach. 2 (Liker Decl. ¶ 32), ECF No. 127-2.) Thus, according to Liker, Samuel is the individual responsible for withholding the logbooks and demanding payment from FX. (First Mot. Summ. J. Ex. A (Liker Decl. ¶ 11), ECF No. 81-2.) Kimbrell, however, maintains that Liker and Samuel were working in concert. (Resp. Opp'n Summ J. Ex. B (Kimbrell Decl. ¶ 34), ECF No. 146-2.)

In any event, without the maintenance records, FX asserts that the Embraer and Boeing were essentially unmarketable. (Mot. Summ. J. Attach. 9 (Kimbrell Dep. 14:19-20), ECF No. 127-9); (Am. Compl. ¶ 74, ECF No. 30.) As a result, FX claims that it was forced to sell the Boeing for scrap at a loss of $1.55 million and the Embraer at a "significantly discount[ed]" price. (Resp. Opp'n Summ J. Ex. B (Kimbrell Decl. ¶ 21), ECF No. 146-2); (Am. Compl. ¶ 65, ECF No. 30.)

## B. Procedural History

On April 19, 2022, FX filed the instant suit alleging civil RICO violations under 18 U.S.C. § 1962(c) and (d).[3] (Compl., ECF No. 1.) After FX amended its complaint, Defendants moved to dismiss, or alternatively, for summary judgment on October 18, 2022, arguing that FX's claims are time-barred by RICO's four-year statute of limitations. (Mem. Supp. Mot. Dismiss, or Alternative, Summ. J. 2-3, ECF No. 33-1.) Applying the "separate accrual" rule, the court denied Defendants' motion on December 9, 2022, finding that "FX's claims are not time-barred in their entirety." FX Aviation Capital, LLC v. Guerrero, No. 6:22-01254-HMH, 2022 WL 19408490, at *3-5 (D.S.C. Dec. 9, 2022) (unpublished). At the same time, the court specifically noted that it "expresse[d] no opinion" as to whether FX had "adequately pled all of the requisite elements of its RICO claims" since Defendants "moved to dismiss only on statute-of-limitation grounds." Id. at *4, *6 n.7.

Defendants filed the instant motion for summary judgment on October 16, 2023. (Mot. Summ. J., ECF No. 127). After receiving an extension of time, on November 14, 2023, FX submitted to the court its response to Defendants' motion, along with a motion to file its response under seal. (Mot. Seal, ECF No. 139.) FX's unopposed motion to seal was granted on December 1, 2023, (Text Order, ECF No. 143), and on December 4, 2023, its response to

---

[3] FX has filed two other lawsuits against LG – one in Greenville County, South Carolina, and another in San Bernardino County, California – arising from the same operative facts. Those lawsuits, which were both filed in 2018, assert claims for claim and delivery, breach of contract, conversion, and declaratory judgment. The California case is set for trial in June 2024, while the South Carolina case is stayed pending resolution of the California case. See Superior Court of California, County of San Bernadino Court Access Portal, https://cap.sb-court.org/search (search by case number "CIVDS1818632") (last visited Dec. 1, 2023); Greenville County 13th Judicial Circuit Public Index, https://www2.greenvillecounty.org/SCJD/PublicIndex/PISearch.aspx (search by case number "2018CP2304501") (last visited Dec. 1, 2023).

Defendants' motion for summary judgment was docketed, (Resp. Opp'n Summ. J., ECF No. 146.) A reply is unnecessary for disposition of this motion. See Local Civ. Rule 7.07 (D.S.C.).

## II. LEGAL STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The court views "all facts and reasonable inferences in the light most favorable to the nonmoving party." Ballengee v. CBS Broad., Inc., 968 F.3d 344, 349 (4th Cir. 2020).

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party does so, the burden shifts to the nonmoving party to "go beyond the pleadings" and come forward with "specific facts showing that there is a genuine issue for trial." Id. at 324. To withstand summary judgment, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013).

## III. DISCUSSION

The civil RICO statute, 18 U.S.C. § 1964(c), creates a cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962." Section 1962(c), in turn, prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce" from "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering

activity."[4]  Thus, to prevail on a civil RICO claim, a plaintiff must establish "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity," Sedima, S.P.R.L. v. Imrex, Co., 473 U.S. 479, 496 (1985), as well as (5) resulting injury to business or property, Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc., 262 F.3d 260, 264 (4th Cir. 2001).

"The term 'racketeering activity' is defined to include a host of so-called predicate acts," Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 647 (2008), including, as relevant here, "any act which is indictable under" 18 U.S.C. § 1343, the federal wire fraud statute.[5]  18 U.S.C. § 1961(1).  The pattern element is met by showing that the defendant committed two or more "related" predicate acts that "amount to or pose a threat of continued criminal activity." H. J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989).  Predicate acts are "related" if they "have the same or similar purposes, results, participants, victims, or methods of commission." Id. at 240 (internal quotation marks omitted).  To meet the continuity requirement, a plaintiff must prove either "a series of related predicates extending over a substantial period of time" (i.e., closed-ended continuity) or "past conduct that by its nature projects into the future with a threat of repetition" (i.e., open-ended continuity). Id. at 241-42.  As explained below, summary judgment is appropriate in this case because FX cannot demonstrate either form of continuity.

First, FX cannot show open-ended continuity because Defendants' racketeering activity, as alleged, had a "built-in ending point." US Airline Pilots Ass'n v. AWAPPA, LLC, 615 F.3d

---

[4] RICO's conspiracy provision, § 1962(d), makes it "unlawful for any person to conspire to violate any of the provisions" of § 1962, including § 1962(c).

[5] FX also asserts violations of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. §§ 1956 and 1957 (money laundering).  FX's amended complaint and RICO case statement, however, contain only conclusory allegations regarding the enterprise's money laundering activities and its use of the mails.  Therefore, the court considers only the alleged predicate acts of wire fraud for purposes of this motion.

312, 319 (4th Cir. 2010).  That is, had Liker and Guerrero been successful in securing releases from their personal guarantees, Defendants' fraudulent scheme would have been over.  See, e.g., id. (finding no open-ended continuity where defendants had the "single goal" of ousting their collective bargaining representative); Gamboa v. Velez, 457 F.3d 703, 708 (7th Cir. 2006) (finding that an alleged scheme to frame a murder suspect did not satisfy the continuity requirement because the scheme "had a built-in end point: once the frame-up was put to rest, the scheme was over"); Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 244 (2d Cir. 1999) ("[A]n 'inherently terminable' scheme does not imply a threat of continued racketeering activity." (quoting GICC Capital Corp. v. Tech. Fin. Grp., Inc., 67 F.3d 463, 466 (2d Cir. 1995))).  FX does not argue otherwise or offer any evidence to support the inference that Defendants' alleged acts of racketeering would continue indefinitely into the future.  See, e.g., Howard v. Am. Online Inc., 208 F.3d 741, 750 (9th Cir. 2000) (finding no open-ended continuity because "[p]laintiffs present[ed] no facts indicating that [a misleading advertising scheme] would continue into the future"); Daedalus Capital LLC v. Vinecombe, 625 F. App'x 973, 976-77 (11th Cir. 2015) (unpublished) (finding no open-ended continuity because "there [was] no longer a working relationship between the two companies giving rise to the opportunity for Defendants' pattern of predicate acts to persist into the future"); cf. H.J. Inc., 492 U.S. at 242 (providing the example of a "hoodlum" who sells "'insurance' to a neighborhood's storekeepers to cover them against breakage of their windows" and then appears monthly to collect the "premium" that continues their "coverage").

      Instead, FX argues that Defendants' conduct constituted a closed-ended pattern of racketeering.  The closed-ended inquiry essentially "asks whether there were enough predicate acts over a finite time to support a conclusion that the criminal behavior would continue."

Menzie v. Seyfarth Shaw LLP, 943 F.3d 328, 337 (7th Cir. 2019). Relevant factors include "the number and variety of predicate acts and the length of time over which they were committed, the number of putative victims, the presence of separate schemes, and the potential for multiple distinct injuries." Brandenburg v. Seidel, 859 F.2d 1179, 1185 (4th Cir. 1988), overruled on other grounds by Quackenbush v. Allstate Ins. Co., 517 U.S. 706 (1996). "[N]o one [factor] is necessarily determinative," and courts are to give "special attention to the context in which the predicate acts occur." Id.

Three Fourth Circuit cases guide the court's analysis of this issue: Flip Mortgage Corp. v. McElhone, 841 F.2d 531 (4th Cir. 1988), Menasco, Inc. v. Wasserman, 886 F.2d 681 (4th Cir. 1989), and Al-Abood ex rel. Al-Abood v. El-Shamari, 217 F.3d 225 (4th Cir. 2000). In Flip Mortgage, the plaintiff and defendant entered into a contract under which the defendant would distribute a computerized mortgage system developed by both parties and then remit 70% of the revenue collected from customers to the plaintiff. 841 F.2d at 533. The plaintiff brought suit after learning that the defendant had "deprived [it] of substantial income" for years by submitting false revenue reports. Id. On appeal, the Fourth Circuit affirmed summary judgment on the plaintiff's RICO claim, reasoning that a single, "narrow[ly] focus[ed]" scheme perpetrated against a single victim over a seven-year period "[did] not rise above the routine . . . [or] resemble the sort of extended, widespread, or particularly dangerous pattern of racketeering which Congress intended to combat with federal penalties." Id. at 538.

In Menasco, the defendant allegedly defrauded two corporations in an oil and gas prospecting venture through various misrepresentations and acts of self-dealing. 886 F.2d at 682. Affirming the dismissal of the plaintiff's RICO claim, the Fourth Circuit declined to find a closed-ended pattern because the perpetrator's "actions were narrowly directed towards a single

9

fraudulent goal" and "involved a limited purpose: to defraud [the plaintiffs] with respect to their oil interests." Id. at 684.

Finally, in Al-Abood, the defendants carried out "three discrete schemes spanning several years" to defraud the plaintiff, a close family friend, of significant sums of money. 217 F.3d at 230, 238. At trial, the district court granted the defendants' motion for judgment as a matter of law on the plaintiff's RICO claim, and the Fourth Circuit affirmed. Id. at 231, 239. The "narrow focus" of the defendants' conduct, "combined with the commonplace predicate acts" of mail and wire fraud, led the Fourth Circuit to conclude that the case was "not sufficiently outside the heartland of fraud cases to warrant RICO treatment." Id. at 238.

In light of these cases, and after considering the factors identified in Brandenburg, the court concludes that FX has not raised a genuine issue of material fact on whether a closed-ended pattern of racketeering exists. FX's allegations suggest that Defendants' racketeering activity occurred over a two-and-a-half-year period. While that time frame might, in some instances, be long enough to support finding a closed-ended pattern, see, e.g., Resol. Tr. Corp. v. Stone, 998 F.2d 1534, 1544 (10th Cir. 1993) (seven to eighteen months long enough to support jury verdict), no other indicia of closed-ended continuity are present here. At its core, this case involves a single scheme with a discrete goal (to defraud FX of loan proceeds), two main perpetrators (Liker and Guerrero), a single victim (FX), and a single type of predicate act (wire fraud) stemming primarily from misrepresentations made via email. The nature of these allegations does not "rise above the routine," Flip Mortgage Corp., 841 F.2d at 538, or place this case "sufficiently outside the heartland of fraud cases to warrant RICO treatment," Al-Abood, 217 F.3d at 238; see Myers v. Finkle, 758 F. Supp. 1102, 1113 (E.D. Va. 1990) (dismissing RICO

claim involving a scheme that allegedly defrauded three victims over four years with respect to fifteen separate investments), aff'd in relevant part, 950 F.2d 165, 169 (4th Cir. 1991).

Indeed, the Fourth Circuit has required much more extensive allegations of racketeering before finding a closed-ended pattern.  See Walk v. Baltimore & Ohio R.R., 890 F.2d 688, 690 (4th Cir. 1989) (finding the pattern element met where the complaint alleged a ten-year scheme to defraud plaintiffs); Morley v. Cohen, 888 F.2d 1006, 1010 (4th Cir. 1989) (affirming RICO judgment and finding the pattern element met where the racketeering activity took place over a five-year period); Combs v. Bakker, 886 F.2d 673, 677-78 (4th Cir. 1989) (holding that the complaint adequately alleged the pattern element in case involving 55,000 individual victims); Busby v. Crown Supply, Inc., 896 F.2d 833, 836 & n.2 (4th Cir. 1990) (holding that an alleged ten-year scheme to repeatedly defraud up to 100 salesmen of their commissions satisfied the pattern element); see also Brandenburg, 859 F.2d at 1186-87 (characterizing the pattern issue as a "close one" even though the predicate acts "spanned a period of more than three years and were directed at more than 22,000 putative victims").

Accordingly, because the undisputed facts do not support a finding of either open-ended or closed-ended continuity, the court grants summary judgment on FX's § 1962(c) claim. Because FX's § 1962(c) claim fails, its conspiracy claim arising under § 1962(d) necessarily fails as well.  GE Inv. Priv. Placement Partners II v. Parker, 247 F.3d 543, 551 n.2 (4th Cir. 2001); Foster v. Wintergreen Real Est. Co., 363 F. App'x 269, 275 n.6 (4th Cir. 2010) (unpublished).

### IV. Conclusion

In this case, FX has lodged what are undoubtedly serious allegations against LG and the individual Defendants.  But those allegations, even if true, do not implicate racketeering activity that is sufficiently continuous to warrant RICO treatment.  Accordingly, it is therefore

**ORDERED** that Defendants' motion for summary judgment, docket number 127, is granted.

**IT IS SO ORDERED.**

s/Henry M. Herlong, Jr.  
Senior United States District Judge

Greenville, South Carolina  
December 6, 2023